UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES of AMERICA  )<br>  )<br>v.                                                  )<br>  )<br>PATRICK JOSEPH,                      )<br>  )<br>      Defendant.                         )<br>  ) | Criminal Action No.<br>21-10231-FDS-1 |

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO
SUPPRESS WIRE AND ELECTRONIC COMMUNICATIONS

**SAYLOR, C.J.**

Defendant Patrick Joseph is charged with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine and cocaine base in violation of 21 U.S.C. § 846. He has moved to suppress wire and electronic communications intercepted by the government pursuant to warrants issued under 18 U.S.C. §§ 2510, *et seq.* ("Title III"), contending that the warrants and surveillance violated the Fourth Amendment and the statutory requirements of Title III, and requests an evidentiary hearing to resolve the motion. For the following reasons, the motion will be denied.

**I.     Background**

    **A.     Factual Background**

In February 2020, the U.S. Postal Service began investigating a possible drug-trafficking organization orchestrating the shipment of cocaine from Puerto Rico to Massachusetts and Rhode Island. During that investigation, Patrick Joseph was identified as a leader within that group. Agents conducted physical surveillance of Joseph and seized several packages containing cocaine connected to Joseph and his associates. After further investigative efforts, the

government applied for a Title III wiretap of three telephones it believed to be linked to Joseph and his associates. In support of that application, the government provided an affidavit prepared by Postal Inspector Jeffrey M. Powers. (Def. Ex. C).

The court found that there was probable cause to believe that Joseph, along with several others, was engaged in certain criminal conduct and that the identified telephones were being used to facilitate that conduct. (Def. Ex. A at 1-2).[1] Acting on that finding, in March 2021, it issued an order authorizing the interception of wire and electronic communications from three telephones, including one belonging to Joseph. Among other things, the order directed as follows:

> All monitoring of wire and electronic communications be conducted in such a way as to minimize the interception and disclosure of communications not relevant to the investigation, or otherwise criminal in nature. Monitoring of conversations will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under 18 U.S.C. Ch. 119.

(*Id.* at 6). It also required periodic status reports to the court. (*Id.* at 8).

In accordance with that order, agents monitoring communications were instructed as to the importance of minimizing non-pertinent calls in a memorandum prepared by the supervising attorneys. As relevant here, that memorandum noted that a determination of a call's pertinence "should not take longer than two minutes." (Gov. Mem. at 5). Agents were provided a copy of the court's order and the minimization memorandum, and attended a meeting to review the minimization requirements. Each monitoring agent was required to certify that they had

---

[1] The court specifically found probable cause to believe that Joseph had committed, was committing, and would continue to commit offenses enumerated in 18 U.S.C. § 2516, including, specifically, possession and distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1); use of a communication facility in the commission of drug-trafficking offenses in violation of 21 U.S.C. § 843(b)(3); conspiracy to commit drug-trafficking offenses, in violation of 21 U.S.C. § 846; and money laundering in violation of 18 U.S.C. §§ 1956 and 1957. (Def. Ex. A at 1-2).

reviewed those documents before participating in the authorized surveillance. (Gov. Mem. at 3).

Interceptions of Joseph's telephone calls under the initial order began on March 23, 2021, and were terminated on April 21, 2021. (Powers Aff. ¶ 16, ECF No. 4-2). During the monitored calls, Joseph allegedly discussed schemes for importing cocaine from the Dominican Republic with several co-conspirators. (Def. Ex. D at 23-54). Agents also overheard him discussing what seemed to be a scheme to fraudulently obtain Payroll Protection Program ("PPP") loans. (*Id.* at 52-54). Agents corroborated information acquired through the wiretap with other means, such as the execution of search warrants and the seizure of parcels containing cocaine.

On April 28, 2021, the court issued a second order authorizing the continued monitoring of Joseph's telephone number. In support of the application for that order, Powers submitted a second affidavit that detailed some of the information that investigators had gleaned from the surveillance authorized by the initial order. (Def. Ex. D). He included information about the apparent PPP loan scheme. (*Id.* ¶¶ 71-72). On that basis, the court found there was probable cause to believe that Joseph was engaged in wire fraud, in violation of 18 U.S.C. § 1343. (Def. Ex. B at 1-3). The extension order authorized surveillance of two of the same telephones that were the subject of the initial order, targeting the same offenses together with the wire-fraud offense. (*Id.*). The order also contained the same minimization requirements that appeared in the initial order. (*Id.* at 2, 6). Surveillance of the target telephones resumed on April 28, 2021, and continued until Joseph was charged by criminal complaint on May 26, 2021.

B.     **Procedural Background**

Defendant was initially charged with conspiracy to distribute and possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846. (ECF No. 4). He was later indicted for conspiracy to commit the same offense, also in violation of 21 U.S.C. § 846. (ECF No. 74). On November 22, 2021, he was separately indicted for conspiracy to commit bank and

wire fraud, in violation of 18 U.S.C. § 1349, wire fraud, in violation of 18 U.S.C. § 1343, and bank fraud, in violation of 18 U.S.C. § 1344. *See United States v. Joseph*, No. 21-10338 (D. Mass. 2021).

In November 2023, defendant moved to suppress "all wire and electronic communications and derivative evidence" obtained pursuant to the court's Title III orders. He contends that the orders and surveillance were unlawful because (1) the orders did not have the requisite particularity required by the Fourth Amendment, (2) the orders failed to comply with the requirements of Title III, (3) the extension order impermissibly expanded the target offenses to include wire fraud, and (4) the government violated the court's orders by failing to "immediately" minimize non-pertinent calls, (Def. Mot. at 1). He contends that those violations warrant the total suppression of any evidence collected during the government's wiretap. He has further requested an evidentiary hearing to develop a factual record.

## II. Analysis

### A. Title III Orders

Defendant contends that the wiretap orders are facially invalid because they permit agents to continue listening to calls that do not necessarily relate to the target offenses but are "otherwise criminal in nature." (Def. Exs. A and B). In his view, that clause circumvents the specificity required by both the Fourth Amendment and Title III in obtaining wiretap orders.

The Fourth Amendment requires that warrants may only issue when it "particularly describe[es] the place to be searched, and the persons or things to be seized." *Berger v. New York*, 388 U.S. 41, 55 (1967) (quoting U.S. Const. amend. IV). "In the wiretap context, those requirements are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized." *United States v. Donovan*, 429 U.S. 413, 427 n.15 (1977).

Title III, meanwhile, requires the government to conduct its surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). A wiretap authorization must contain, among other things, "a statement of the particular offense to which [the communication to be intercepted] relates." 18 U.S.C. § 2518(4)(c). But Title III also provides that, in some circumstances, "intercepted conversations involving crimes other than those identified in the order may be used in evidence." *United States v. Kahn*, 415 U.S. 143, 154 n.13 (1974); *see also* 18 U.S.C. § 2517(5).

If an order is facially invalid under Title III, the statute provides for the suppression of wiretap evidence on the ground that "the order of authorization or approval under which it was intercepted [was] insufficient on its face[.]" 18 U.S.C. § 2518(10)(a)(ii). Even still, "not every defect results in an insufficiency" warranting suppression. *Dahda v. United States*, 584 U.S. 440, 450 (2018). Even if an order includes defective language, provided it contains the minimum statutory requirements, it will not be "insufficient" within the meaning of Title III. *Id.*

Here, the court's orders were facially valid. Both authorizations specifically described the target telephones to be tapped, including one associated with defendant, and specifically listed the target offenses. (Def. Exs. A and B). The court clearly set forth the circumstances in which a call could be intercepted by law enforcement and provided specific procedures to avoid impermissibly intruding into irrelevant conversations, including the minimization language at issue. The minimum requirements for such an order were therefore met. Even if the specific language of the minimization order was defective, therefore, that alone would not be enough to vitiate the fact that the authorizations complied with Title III. *See Dahda*, 584 U.S. at 450.

Even if the minimum requirements were not met, allowing agents to listen to other calls that were "otherwise criminal in nature,' accounts for the fact that monitoring agents may

5

overhear information relating to "both a specified offense and to an unspecified offense." *United States v. London*, 66 F.3d 1227, 1234-35 (1st Cir. 1995). In those situations, the government need not ignore that new information, unless the interception was "motivated by an illicit purpose," such as using a target offense to circumvent the probable-cause requirement to target an unauthorized offense. *Id.*; *see also United States v. Southard*, 700 F.2d 1, 29 (1st Cir. 1983) ("Officers attending a properly authorized, limited, and supervised wiretap have no obligation to close their ears to unexpected incriminating information on matters unrelated to their immediate investigation."); *United States v. Ramirez*, 112 F.3d 849, 851 (7th Cir. 1997) ("[I]f government agents execute a valid wiretap order . . . and at the same time overhear incriminating conversations, the record of the conversations is admissible in evidence."). That general principle is similar to the plain-view doctrine of the Fourth Amendment, which permits agents who observe criminal conduct from a lawful vantage to present evidence of that conduct. *United States v. Hernandez-Mieses*, 931 F.3d 134, 140 (1st Cir. 2019).

The orders here, therefore, complied with the requirements of the Fourth Amendment and Title III, and the motion will be denied as to its claim that they were facially insufficient.

### B. Extension Order

Defendant next contends that there was insufficient probable cause to support the court's addition of wire fraud to the target offenses in the extension order, that there was no showing that it was "necessary" within the meaning of Title III, and that the government failed to obtain court authorization for listening for evidence of wire fraud "as soon as practicable."

In reviewing the decision to issue a wiretap order, a court must "examine[] the face of the affidavit and 'decide if the facts set forth in the application were minimally adequate to support the determination that was made.'" *United States v. Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003) (quoting *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989)).

1. **Probable Cause**

Before a wiretap can be authorized, Title III requires that the government show "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense." 18 U.S.C. § 2518(3)(a). "Probable cause exists when the affidavit demonstrates in some trustworthy fashion the likelihood that an offense has been or is being committed." *United States v. Santana*, 342 F.3d 60, 65 (1st Cir. 2003) (citing *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999)). A reviewing court must consider the "totality of the circumstances stated in the affidavit" and make a "practical, common-sense determination, according deference to reasonable inferences that the issuing judge may have drawn." *United States v. Sylvestre*, 78 F.4th 28, 33 (1st Cir. 2023) (quotations and citations omitted), *cert. denied*, 144 S. Ct. 370 (2023); *see also Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.").

Defendant specifically challenges the court's finding of probable cause to believe he was engaged in wire fraud. In the affidavit in support of the government's application to extend the Title III order, Powers submitted specific evidence of intercepted conversations that he believed provided probable cause for wire fraud, including an assertion that the fraudulent scheme was being used to facilitate money laundering. (Def. Ex. D ¶¶ 45, 71-72). The affidavit included details of intercepted conversations between defendant and an alleged co-conspirator, which appear to have included methods of obtaining loans, ensuring forgiveness of those loans despite lacking the required criteria, and plans to divide the proceeds between would-be applicants and themselves. (*Id.*).

In considering the totality of the circumstances, the facts that set forth the affidavit are substantially beyond the "minimally adequate" threshold to establish probable cause to believe

that defendant was involved in a wire fraud scheme involving PPP loans, and that further interception would reveal more information about his involvement in that offense.

Moreover, even assuming the order were invalid, it was certainly not so clearly invalid to overcome the monitoring agents' reasonable, good-faith reliance on them, which alone would counsel against suppression.  *See United States v. Leon*, 468 U.S. 897, 926 (1984).

Accordingly, the motion will not be granted on that basis.

### 2. **Necessity**

Under Title III, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  "[T]he government is not required to show that other investigative methods have been wholly unsuccessful," only that "it has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. Cartagena*, 593 F.3d 104, 109 (1st Cir. 2010) (quotations and citations omitted).  "The determination of necessity is properly committed to the issuing judge in the first instance, and [the reviewing court] will uphold the sufficiency of the affidavit wherever 'the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed.'" *United States v. Yeje-Cabrera*, 430 F.3d 1 (1st Cir. 2005) (quoting *United States v. Lopez*, 300 F.3d 46, 53 (1st Cir. 2002)).  An order may be upheld "based on an agent's plausible, good faith "assert[ion of] a well-founded belief that the techniques already employed during the course of the investigation had failed to establish the identity of conspirators, sources of drug supply, or the location of drug proceeds." *United States v. Gordon*, 871 F.3d 35, 46 (1st Cir. 2017) (quoting *United States v. Rodrigues*, 850 F.3d 1, 10 (1st Cir. 2017)); *see also Ashley*, 876 F.2d at 1074 (finding wiretap application and supporting

affidavit sufficient where the agent believed that further interceptions would "illuminate details of the cocaine conspiracy including the roles of the participants and the financial backing").

Defendant does not appear to contest that the government adequately demonstrated "necessity" concerning the drug-related crimes. Instead, he contends that it did not exhaust its investigative options specifically as to the wire-fraud allegation contained in the second affidavit. In support of that position, he points out that Powers appears to admit that other investigative efforts were being made when he prepared the affidavit. (Def. Ex. D ¶ 89).

In the same affidavit, however, Powers directly discussed the financial investigation into defendant, including his business and real-estate holdings, along with his alleged co-conspirators. (*Id.* ¶¶ 83-89). That discussion concluded that the possible loan-fraud scheme was connected to money-laundering efforts that were, in turn, part of the drug-trafficking organization, but that the financial investigation had been able to reveal that connection. (*Id.* ¶ 89). In discussing the prior wiretap, the affidavit also specified that "[p]rior intercepted communications and a review of financial records have, thus far, not shown that [defendant] is paying these loan applicants in cash drug proceeds to pay-off the loans in return for them writing checks to him that creates the appearance of legitimate income." (*Id.* ¶ 94).

If the only goal of the investigation was to uncover evidence of wire fraud, defendant may have been correct that other investigative techniques might have been sufficient. But when the court issued the extension order, wire fraud was only a component of the broader investigation into the tactics and practices of a large drug-trafficking organization—and agents were engaged in a process of understanding its full extent. While the government had already achieved some success in investigating that organization, the fundamental purpose of the extension order was to continue that same inquiry. Given that scope, Powers addressed a nearly

exhaustive list of alternative techniques that had either been attempted, or he believed would be fruitless to attempt, including the use of informants and undercover agents, financial investigations, prior wiretaps, interviews of subjects, use of pen registers and other technologies, search warrants, discarded trash, physical surveillance, and arrests. The affidavit reveals Powers's "well-founded belief" that the loan-fraud scheme could have been—or even was likely—part of the money-laundering cog of a larger criminal machine. To understand that machine, he articulated that a wiretap was "necessary" to "lay[] bare the full reach of the crimes that [were] under investigation." *See United States v. Santana-Dones*, 920 F.3d 70, 77 (1st Cir. 2019); *see also United States v. Santiago*, 389 F. Supp. 2d 124, 128-29 (D. Mass. 2005). Accordingly, the motion will not be granted on this basis.

### 3. "As Soon as Practicable"

Finally, defendant contends that the government improperly failed to apply for a new Title III warrant that included wire fraud as a target offense between first learning of its possibility on March 24, 2021, until the extension order on April 28, 2021.[2]

Although the precise contours of what interval is "as soon as practicable," the bare assertion of a violation cannot by itself warrant suppression. *See Southard*, 700 F.2d at 30-31 (upholding the grant of a subsequent wiretap application after a 19-month delay). Defendant has not alleged that any delay prejudiced him in any way, and nothing suggests that the delay was intended as a "subterfuge," undermining the essential purposes of Title III. *See id.* Therefore, based on the present record, any delay did not violate the requirements of Title III, and defendant's motion will not be granted on that basis.

---

[2] The government has represented that it informed the court of the possible wire-fraud conduct at its first progress report with the court, two weeks after the wiretap began. (Gov. Opp'n at 17).

### C.   Minimization

Defendant next contends that the government failed to abide by the court's minimization order, which directed that monitoring agents minimize calls "immediately" after determining that they were not pertinent to the investigation. That claim is based on an apparent grouping of non-pertinent calls that were minimized after agents listened for approximately two minutes.

#### 1.   Evidentiary Burden

A threshold issue is who bears the evidentiary burden to show that suppression is appropriate at this stage. The First Circuit has not directly addressed which party bears the burden of showing adequate minimization procedures upon a motion to suppress. *See United States v. Lopez*, 2000 WL 761977, at *6 (D. Me. Apr. 28, 2000), *aff'd*, 300 F.3d 46 (1st Cir. 2002); *United States v. Tam*, 2023 WL 4304667, at *6 n.11 (D. Mass. June 30, 2023). Many courts, however, have employed a burden-shifting approach under which, when minimization procedures are challenged, the government bears an initial burden to show that its tactics were *prima facie* reasonable. *Tam*, 2000 WL 761977, at *6 (collecting cases). If that threshold is met, the burden shifts to the defendant to establish the government's procedures were inadequate. *Id.*

Although the burden-shifting framework has not been established in the First Circuit, the Court is persuaded in light of its supporting authority that it represents a practical and sensible approach, and accordingly will follow it here.

#### 2.   The Government's Initial Burden

Every Title III order must "contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." 18 U.S.C. § 2518(5); *see also Scott v. United States*, 436 U.S. 128, 140 (1978) (explaining that Title III "instructs the agents to conduct the surveillance in such a manner as to minimize the interception of [irrelevant] conversations").

11

Where, as here, the authorizing order instructs the government to minimize non-pertinent communications, a court must determine whether its monitoring agents' efforts were objectively reasonable given the circumstances they confronted. *Scott*, 436 U.S. at 138. To determine whether the agents' actions were reasonable, courts may consider a variety of factors, including "(1) the nature and complexity of the suspected crimes; (2) the thoroughness of the government's precautions to bring about minimization; and (3) the degree of judicial supervision over the surveillance process." *Gordon*, 871 F.3d at 48 (quoting *Lopez*, 300 F.3d at 57). In particular, "where an investigation involves a drug ring of unknown proportion, as in this case, 'the need to allow latitude to eavesdroppers is close to its zenith.'" *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (quoting *United States v. Hoffman*, 832 F.2d 1299, 1308 (1st Cir. 1987)). "Blanket suppression of wiretap evidence is a 'drastic' remedy, which should be reserved for the most 'egregious' cases." *Gordon*, 871 F.3d at 47 (quoting *Hoffman*, 832 F.2d at 1309).

As discussed, the government bears an initial burden to show that its actions were reasonable in light of the objective circumstances. The factors endorsed by the First Circuit in *Gordon* guide that analysis.

First, this case involved an investigation into a complex conspiracy involving multiple participants. Many of those individuals appear to have shared familial or social relationships along with their allegedly criminal ties. Defendant spoke multiple languages, including English and Haitian Creole. (*See* Def. Ex. E); *see also Gordon*, 871 F.3d at 48 ("The use of a foreign language itself supplies an extra layer of complexity."). And, unsurprisingly, the conversations often contained a mixture of pertinent and non-pertinent information, and included cryptic and apparently coded references. The monitoring agents' latitude in determining whether a call is pertinent is therefore at its "zenith" here because of the difficulties of understanding the

12

conversations and untangling personal from criminal connections.  *Charles*, 213 F.3d 22; *see, e.g.*, *Tam*, 2023 WL 4304667, at *5; *United States v. Alkayisi*, 2023 WL 7134848, at *3 (D. Mass. Oct. 30, 2023); *United States v. Le*, 377 F. Supp. 2d 245, 266-68 (D. Me. 2005), *aff'd sub nom. United States v. Cao*, 471 F.3d 1 (1st Cir. 2006).  It can take investigators time to make a reasonable determination of the pertinence of any single call, especially where, as here, subjects might be speaking different languages, using coded words and phrases, or exchanging pleasantries and news before turning to more relevant matters.

Furthermore, investigations such as this are dynamic, and the importance of some information is not always immediately apparent; some details may only reveal their significance in either the broader context of the investigation or the narrower context of the mode and speakers involved in a given conversation.  During the two wiretaps at issue, agents were still investigating who the conspirators were, how they were transporting drugs, and what coded language they used to refer to their operations.  (Def. Ex. D at 23-54).  It is telling, for example, that between the initial and extension orders, the investigation expanded to include fourteen additional subjects.  (*See* Def. Exs. A and B).

Second, the government took clear precautions to ensure that its agents complied with the orders' minimization requirements.  Along with the minimization memorandum, a supervising attorney specifically briefed the monitoring agents concerning the importance of minimization, ensured that both the orders and memorandum were available to the monitors, and mandated that every monitor certify that they had reviewed both documents.  (Gov. Mem. at 3).  The government has also provided statistical data showing that out of 687 non-pertinent calls, 296 lasting more than two minutes—or 43 percent—were minimized.  (Gov. Ex. F).  By contrast, the First Circuit in *Gordon* denied suppression after finding that less than a third of non-pertinent

13

calls had been minimized. *See Gordon*, 871 F.3d at 49 (finding a failure to minimize more non-pertinent calls did not cause a "taint upon the investigation as a whole"). In other words, the degree of the government's accuracy in minimizing non-pertinent calls exceeded the permissible level from *Gordon* by at least ten percent. *See id.*[3]

Third, there was significant judicial supervision of the surveillance process. The court was provided regular progress reports, and properly extended the initial Title III order to include another target offense. There is no indication, and defendant does not assert, that the degree of judicial supervision was inadequate in any respect.

Although Title III requires minimization, it does not require perfection in execution. It is the "facts and circumstances of each case" that dictate whether the government's actions were reasonable, not any categorical bar. *Scott*, 436 U.S. at 140. In light of the present record here, the government has met its burden to show its tactics were *prima facie* reasonable. The burden therefore shifts to defendant to refute that showing.

### 3. Defendant's Response

Defendant has not produced evidence of a statistically significant pattern, or any other substantial evidence, to support the assertion that there existed an unwritten policy requiring agents to listen to a call for two minutes without regard to whether it was pertinent. *Cf. Gordon*, 871 F.3d at 49 ("Tellingly, there is no evidence of a slew of examples of calls that plainly should have been minimized in less than two minutes, but were not."). In fact, the government has submitted statistical evidence that, of the calls that themselves lasted for less than two minutes,

---

[3] The same statistical analysis also discloses that 68 intercepted calls were marked as "privileged," again suggesting an awareness and desire to comply with the wiretap restrictions. (Gov. Ex. A).

many were terminated before they concluded—something that would not have occurred if the alleged policy was actually in place.

Even if the Court were to agree with defendant's basic proposition—that there is a pattern of calls minimized "around" two minutes—that fact alone does nothing to suggest a pattern of egregious behavior. Indeed, in light of the government's memorandum instructing its agents that their decision on whether to minimize should take "no more than two minutes," any apparent grouping around that timeframe could equally suggest conscientious *compliance* with the requirements of Title III, given that an agent might opt to end a plausibly pertinent call early so as to obey the guideline instruction.

In sum, the government has met its burden to show that its actions were *prima facie* reasonable in light of the objective circumstances it faced, and defendant has not overcome that showing. There is, accordingly, no basis to conclude that the challenged procedures were so "egregious" as to warrant suppression, and the motion to suppress that evidence will therefore be denied.

### D.     **Evidentiary Hearing**

No criminal defendant has "a presumptive right to [a general] evidentiary hearing on a motion to suppress." *Gordon*, 871 F.3d at 47-48 (citing *United States v. D'Andrea*, 648 F.3d 1, 5 (1st Cir. 2011)). "A hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." *United States v. Staula*, 80 F.3d 596, 603 (1st Cir. 1996) (citation omitted).

An evidentiary hearing is not warranted here. Defendant has not demonstrated that there is any doubt or dispute over the facts at issue that cannot be resolved on the present record. Accordingly, that request will be denied.

### III.     Conclusion

For the foregoing reasons, defendant's motion to suppress wire and electronic communications is DENIED.

**So Ordered.**

Dated:  February 6, 2024

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court